UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| VANOY ALLEN | CIVIL ACTION |
| VERSUS | |
| OUR LADY OF THE LAKE HOSPITAL, INC. | NO. 19-00575-BAJ-SDJ |

### RULING AND ORDER

This is an employment discrimination case. Plaintiff alleges that while working as a nurse for Defendant Our Lady Of The Lake Hospital, Inc. ("OLOL") she suffered an unbroken pattern of racial slights and discriminations ultimately resulting in her resignation in October 2018. Plaintiff's Amended Complaint asserts claims of hostile work environment, constructive discharge, and retaliation due to her race (African-American), in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). (Doc. 29).

Now before the Court is OLOL's **Motion For Summary Judgment (Doc. 46)**, which seeks dismissal of Plaintiff's action, arguing that regardless what Plaintiff has *alleged*, the summary judgment *evidence* does not substantiate her claims. Plaintiff concedes that her retaliation claim must be dismissed, but nonetheless insists that her hostile work environment claim and constructive discharge claim must proceed to trial. (Doc. 49). For reasons to follow, OLOL's Motion will be granted, and Plaintiff's action will be dismissed with prejudice.

I.  BACKGROUND

A. Summary Judgment Evidence

The facts set forth below are drawn from OLOL's Statement Of Uncontested Material Facts In Support Of Motion For Summary Judgment (Doc. 46-2, "OLOL SOF"), Plaintiff's Response To Defendant's Statement Of Uncontested Material Facts (Doc. 49-1, "Opposing SOF"), and the competent record evidence submitted in support of these pleadings.[1]

i. OLOL segments its nurses according to "status," and assigns duties and related rights and privileges accordingly

Plaintiff is a Registered Nurse (RN). In May 2011, OLOL hired Plaintiff to work at its hospital campus in Baton Rouge, Louisiana. At first, Plaintiff was assigned to a "step down unit" caring for post-surgery patients. In August 2012, however, Plaintiff was re-assigned to the Cardiac Intensive Care Unit (CICU). Plaintiff continued working in the CICU until her resignation in October 2018.

In December 2014, Plaintiff elected to switch from full-time employment status

---

[1] This Court's Local Civil Rules set forth detailed guidance regarding summary judgment practice. Most relevant here, Local Rule 56(c) requires that a party opposing summary judgment shall submit "a separate, short, and concise" opposing statement of material facts citing specifically to record evidence contradicting the moving party's statement of material facts, and Local Rule 56(f) warns that the Court "shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts."

In contradiction of these Rules, Plaintiff's Opposing SOF includes large swaths of unsupported and conclusory allegations, and repetitive and immaterial information not obviously connected to the discrete facts set forth in OLOL's SOF. Further, Plaintiff's Opposing SOF omits *multiple* facts relied on by Plaintiff in her opposition brief. Plaintiff's scattershot approach renders a muddled (at times, indecipherable) account of the material events preceding her resignation. Still, while under no obligation to do so, the Court has endeavored to reconstruct these facts in the light most favorable to Plaintiff.

to "PRN (or as needed) status." (Doc. 49-1 at 5; OLOL SOF ¶ 1; Opposing SOF ¶ 1). PRN nurses "provide supplemental staffing," (OLOL SOF ¶ 3; Opposing SOF ¶ 3[2]), and "'fill in the holes' as needed." (OLOL SOF ¶ 5; Opposing SOF ¶ 5). Importantly, PRN nurses do *not* have the same duties as "regularly scheduled staff nurses," and, in turn, do *not* have the same "rights and privileges of ... regularly scheduled staff nurse[s]." (OLOL SOF ¶ 4; Opposing SOF ¶ 4[3]). Most relevant here, with some exceptions, PRN nurses do "not perform in the charge role and generally would not admit patients directly from the Operating Room immediately post open heart surgery." (OLOL SOF ¶ 6; Opposing SOF ¶ 6[4]).

Historically, OLOL's expectations of its PRN nurses were "unwritten." (Doc. 46-5 at p. 9). This changed, however, in June 2017, when Plaintiff's Supervisor Kathleen Hussain published written guidelines for PRN nurses, aimed to "clear expectations for everyone." (*See id.*; *see also* OLOL SOF ¶ 7; Opposing SOF ¶ 7). To

---

[2] Plaintiff "denies" this fact, yet fails to specifically cite evidence controverting that PRN nurses "provide supplemental staffing." (Opposing SOF at ¶ 3). Accordingly, under Local Rules 56(d) and 56(f), the Court deems admitted that PRN nurses "provide supplemental staffing." *See N. Frac Proppants, LLC v. Regions Bank, NA*, No. 19-cv-00811, 2022 WL 1297180, at *1 n.1 (M.D. La. Apr. 29, 2022) (defendant's proposed facts deemed admitted as written due to plaintiffs' failure to properly support their "qualified" admissions).

[3] Again, Plaintiff "denies" these facts, yet fails to specifically cite evidence controverting them. (Opposing SOF at ¶¶ 3-4). In fact, oddly enough, Plaintiff directs the Court's attention to evidence that tends to *support* these alleged facts, including that Plaintiff's Supervisor, Kathleen Hussain, testified at her deposition that "the expectations were that PRN nurses would not perform in the charge role and generally would not care for fresh heart patients." (*Id.* ¶ 3). Accordingly, the Court deems admitted that that PRN nurses lack the same duties, rights, and privileges as "regularly scheduled staff nurses." *See supra*, n.2.

[4] Again, Plaintiff "denies" these facts, yet a fair reading of her evidence tends to support them (Opposing SOF at ¶¶ 3, 6). Thus, as before, the Court deems admitted that PRN nurses traditionally did "not perform in the charge role and generally would not admit patients directly from the Operating Room immediately post open heart surgery." *See supra*, n.2.

3

the point, these written guidelines state:

> 1. The nature of PRN is casual employment to provide supplemental staffing to the home unit. Based on this PRN nurses are not required to have the same obligations of regularly scheduled staff nurses and as such should not have the same expectations of rights and privileges of a regularly scheduled staff nurse.
>
> 2. PRNs will work a minimum of 2 shifts (24 hours) each and every 6 week schedule on their home unit HVCU. ...
>
> ...
>
> 5. Open shifts will be posted in the breakroom at the start of each schedule
>
>     a. PRNs are to use this list to sign up for their shifts
>     b. PRNs may schedule shifts on a day to day or week to week basis that is subject to the staffing needs of HVCU
>     c. Contact the supervisor(s) or nurse manager to schedule
>     d. Changes to your schedule once on the books must be made to the unit supervisor or nurse manager.
>
> ...
>
> 8. PRNs will care for both ICU and telemetry level patients as is consistent with the universal model.
>
>     a. PRNs will not admit fresh post-op hearts from the OR
>     b. PRNs who have demonstrated ongoing competency may care for op day hearts after the first 4-6 hours
>     c. PRNs will not act as the charge nurse
>     d. PRNs will not precept new team members

(Doc. 46-5 at pp. 58-59).

Still, even after Supervisor Hussain published these written guidelines, PRN nurses would sometimes be required "to assume a charge nurse responsibility or admit a patient directly from the operating room," depending on "census in the ICU" and the "acuity of patients." (OLOL SOF ¶ 8; Opposing SOF ¶ 8).

### ii. Plaintiff complains that she was harassed and denied incentive pay and certain shifts due to her race

Plaintiff is African American, and contends that during her tenure at OLOL she suffered multiple insults and discriminations due to her race. Plaintiff now admits that many of the *alleged* abuses set forth in her Amended Complaint did *not* occur.[5] Further, multiple other allegations are now contradicted by Plaintiff's own testimony,[6] or not supported by competent record evidence.[7] After these unsupported allegations are removed, only the following alleged unlawful acts remain: (1) Dr. Boedefeld, a cardiac surgeon, subjected Plaintiff to harassment and intimidation at various times throughout 2012 and 2013, and once again "[s]ometime in 2017," (Doc.

---

[5] Plaintiff alleged that on September 14, 2016, she attended a meeting at which Supervisor Hussein "essentially stated that African slaves were inferior to white persons and made additional overtly racist comments." (Doc. 29 ¶ 14). Now Plaintiff admits that this never happened. (OLOL SOF ¶¶ 18-19; Opposing SOF ¶¶ 18-19). Further, despite having alleged that she was denied "an hourly increase in pay while caring for open 'fresh' heart patients," (Doc. 29 ¶ 9), Plaintiff now concedes that "[c]aring for fresh heart patients did not result in an increase in hourly pay" (OLOL SOF ¶ 15; Opposing SOF ¶ 15).

[6] Plaintiff alleged that in September 2016 OLOL modified the education requirements for the Resource Nurse position, which was formerly held by Rose Pettyjohn (a white nurse), so that Plaintiff was disqualified from applying. (Doc. 29 ¶¶ 12-13). At her deposition, however, Plaintiff's admitted that the Resource Nurse position was *not* backfilled after Nurse Pettyjohn's retirement. (*See* Doc. 46-4 at p. 143 ("Q. Okay. Do you know if anyone ever assumed the position of resource nurse after Rose Pettijohn [sic] retired? A. I don't think we had a resource nurse. I don't think they did after I inquired about it. I don't believe they ever hired another resource nurse."); *see also* Doc. 46-7 at pp. 69-70).

[7] Plaintiff alleged that from 2017 to the end of her employment, OLOL permitted white PRN nurses to receive training on how to perform the "Impella procedure" on cardiac patients, but denied Plaintiff the same training. (Doc. 29 ¶¶ 24-26). To support this allegation, Plaintiff cites exclusively to a document purporting to contain notes of an "Interview of Samantha Karla Valentine," a RN at OLOL. (Opposing SOF ¶ 11). Yet, these "interview notes" have not been authenticated. Thus, they are not competent summary judgment evidence, and will be disregarded for all purposes. *See Frazier v. Cinemark USA Inc.*, 348 F. App'x 6, 8 (5th Cir. 2009) (audiotape of employee-plaintiff's hearing before the Oklahoma Employment Security Commission submitted in opposition to employer's motion for summary judgment "was not properly authenticated and therefore did not constitute competent summary judgment evidence").

29 ¶¶ 5-7, 19); (2) OLOL denied Plaintiff incentive pay compensation from 2013 to 2017, (*id.* ¶ 8); (3) OLOL denied Plaintiff charge nurse shifts and fresh post open heart surgery shifts from 2014 onward, (*id.* ¶¶ 7, 9, 10, 18); and (4) Supervisor Hussain refused Plaintiff's request for a meeting following a "poor annual evaluation," (*id.* ¶ 31). The Court sets forth the evidence regarding each of these allegations below.

### a. Plaintiff's interactions with Dr. Boedefeld

At her deposition, Plaintiff recounted that Dr. Boedefeld told multiple coworkers that she was "hired … only because [she] was black," twice refused to discuss cases (patients) with her, choosing instead to discuss them with white nurses, and, twice publicly yelled at her. Plaintiff also vaguely recounted an incident occurring in 2017, when Dr. Boedefeld "questioned" Plaintiff's supervisor after Plaintiff was assigned to one of his patients. Plaintiff further stated her belief that Dr. Boedefeld's "behavior towards me since 2012 always had to do with my race." (Doc. 46-4 at p. 63; *see generally id.* at pp. 45-64).

As additional support for these allegations, Plaintiff cites deposition testimony of Barbara Hill, her former manager in the CICU, wherein Hill stated her opinion that Dr. Boedefeld "was racist" based on his "aura of disrespect," and frequent "generalized complaints" that Black nurses lacked "experience." (*See* Doc. 49-2 at pp. 51-71). More specifically, Manager Hill recounted one instance when Dr. Boedefeld summoned her to a patient's room demanding that a Black nurse be fired for failing to respond to the patient's requests for pain medicine. Dr. Boedefeld immediately "changed his tune," however, when the patient clarified that it was a white nurse that

failed to respond, not a Black nurse. Thereafter, Dr. Boedefeld allegedly said to Manager Hill: "[D]on't worry about it. Don't worry about firing anybody. She's a complainer. Don't worry about it. She's probably confused, anyway." (Doc. 49-2 at p. 45; *see id.* at pp. 43-47). Based on this interaction (among others), Manager Hill stated that Dr. Boedefeld treated Black nurses differently than white nurses, and, consequently, that Black nurses' "jobs were on the line every day." (*Id.* at p. 52).[8]

### b. Discriminatory incentive pay practices

When the CICU was short-staffed, Supervisor Hussain could (and would) "offer additional shift incentives to secure a nurse to work a shift." (OLOL SOF ¶ 22; Opposing SOF ¶ 22). Plaintiff contends that from 2013 to 2017, she was systematically denied opportunities for incentive pay. (Doc. 29 ¶ 8). Significantly, however, Plaintiff's only evidence supporting her claim that she was denied incentive pay is her own deposition testimony, where she admitted: (1) she had been offered incentive pay on occasion; (2) she could not identify a specific instance when she was denied incentive pay; and (3) she was not aware of any other Black nurses that were denied incentive pay. (Doc. 46-4 at pp. 133-34). Indeed, Plaintiff explained that she only believed she was wrongfully denied incentive pay opportunities because she overheard conversations among white nurses wherein they claimed to have "come in for IP [incentive pay]." (*Id.*).

---

[8] For its part, OLOL does not dispute that Dr. Boedefeld behaved boorishly. (See Doc. 46-1 at pp. 18-19). Rather, OLOL insists that Dr. Boedefeld was equally abrasive to Black nurses and white nurses alike, and that his treatment of Plaintiff was based on "his [professional] opinion regarding her competency as a nurse," not her race. (*Id.*).

7

### c. Discriminatory shift assignment practices

Additionally, Plaintiff contends that from 2014 onward, OLOL systematically refused to schedule her for charge nurse shifts or for fresh post open heart surgery shifts—*i.e.*, precisely the shifts that were not traditionally available to PRNs under OLOL's unwritten *and* written guidance. In support of these allegations, Plaintiff again cites exclusively to her own deposition testimony, where she recounted that she was "often" denied such shifts, and specifically recalled one instance in February 2018 when she requested to work a shift in the CICU, and the shift was awarded instead to two "full-time nurses" from another unit. (Doc. 46-4 at pp. 136). Again, however, Plaintiff testified that she was not aware of any other Black nurses suffering the same treatment. (Doc. 46-4 at pp. 138).

Plaintiff testified that she complained multiple times to her managers regarding OLOL's discriminatory shift assignment practices, and was eventually informed that she was not being assigned charge nurse shifts or fresh post open heart surgery shifts because she "was PRN." (Doc. 46-4 at p. 145).[9]

---

[9] In her opposition memo (but not in her Opposing SOF) Plaintiff asserts that "Ninety percent of the time, white nurses were given the charge nurse shift," citing to deposition testimony of Clinical Service Representative (CSR) Melissa White. (Doc. 49 at 5). Conceivably, this fact, if established, could be relevant to Plaintiff's remaining claims of hostile work environment and constructive discharge. However, CSR White's testimony on this point was hardly definitive. Indeed, despite having previously interviewed with Plaintiff's counsel, at her deposition CSR White initially could not "recall" making the statement that charge shifts were "given to white nurses ... about 90 percent of the time." (Doc. 49-5 at p. 6). Only after counsel "refreshed" her memory with a recording of the prior interview did CSR admit her "belief that about 90 percent of the time the white nurses would be given charge nurse shifts." (*Id.* at p. 7). Immediately thereafter, however, CSR White provided a qualification, stating "because it may have had seven Caucasian nurses versus three black nurses, but the seven Caucasian nurses may have had more experience at being a charge nurse." (*Id.*).

8

#### d. Plaintiff's performance evaluation

Finally, Plaintiff contends that in June 2018 she received a poor annual evaluation, requested to discuss it with Supervisor Hussain, and was refused. In support of these allegations, Plaintiff again cites exclusively to her own deposition testimony:

> Q. ... Do you know who completed the poor evaluation referenced in paragraph 31 of your amended complaint?
>
> A. If it's an annual review it would have been the manager, Kathleen [Hussain].
>
> Q. Kathleen, okay. And did you ask her to review the evaluation with you?
>
> A. Several times.
>
> Q. And she refused to do so?
>
> A. Correct.
>
> Q. Did she give you a reason why she was refusing to review it?
>
> A. No, she didn't.
>
> Q. What about the evaluation made you believe that it was, quote, another instance of racial discrimination and harassment?
>
> A. I felt like on some of the points and I don't remember what it was at the time, but reviewing it I was scored lower than I felt like I deserved.
>
> Q. Did you see anyone else's evaluations that were done around this time period?
>
> A. No, I didn't.
>
> Q. Are you aware of any other nurses on the unit who were African-American who received poor evaluations around this time period?
>
> A. African-American, white, anybody, no.

---

Unfortunately, Counsel did not press to clarify what CSR White meant by this qualification, which renders her testimony virtually inscrutable.

As a rule, summary judgment evidence "must be particularized, not vague or conclusory." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021). In sum, the Court determines that this testimony is too vague and conclusory for purposes of creating an issue of fact at summary judgment. Accordingly, it is disregarded. *See id.*

9

(Doc. 46-4 at pp. 152-153). The parties agree that "[n]o other Black nurses or White nurses received a 'poor' evaluation around the time that [Plaintiff] ... received a poor review." (OLOL SOF ¶ 12; Opposing SOF ¶ 12).

### e. Additional insults

In addition, Plaintiff's Opposing SOF recounts two more incidents:

First, on an unspecified date, during a "general staff meeting" "surrounded by all white coworkers," Supervisor Hussain said to Plaintiff, "Vanoy you don't have a voice," which Plaintiff interpreted "to mean that because she was Black, she should not say anything." (Doc. 49-1 at p. 2; *see* Doc. 46-4 at pp. 99-101).

Second, in August 2016, a co-worker publicly referred to Plaintiff as a "bitch." (Doc. 49-1 at p. 2; *see* Doc. 46-7 at pp. 36-43). Plaintiff complained of this interaction to Supervisor Hussain, who responded that it is "okay" to use the word "bitch" between friends, while knowing that Plaintiff and this particular co-worker were *not* friends. (Doc. 46-4 at p. 74).

### iii. Plaintiff resigns in October 2018 citing "racism and retaliation"

On October 17, 2018, Plaintiff tendered her written resignation to OLOL citing "constant vicious lies and acts of racism and retaliation." (Doc. 49-10 at p. 1).

### B. Procedural History

On December 15, 2017—*prior* to her resignation—Plaintiff filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC). (Doc. 1 at ¶ 33). On June 7, 2019—*after* her resignation—the EEOC issued Plaintiff a right-to-sue letter. (*Id.* at ¶ 34).

On September 3, 2019, Plaintiff initiated this action. Plaintiff's original *pro se* Complaint alleged race and age discrimination, retaliation, hostile work environment, and other violations of federal *and* state law. (Doc. 1).

Thereafter, Plaintiff retained counsel, and on November 8, 2021 submitted her Amended Complaint, limiting her action to claims of (1) hostile work environment, (2) constructive discharge, and (3) retaliation. (Doc. 29).

Now OLOL moves for summary judgment, arguing that Plaintiff has failed to develop any evidence regarding multiple essential elements of her claims, including an adverse employment action, less favorable treatment, OLOL's pretextual motivation, and the type of severe and pervasive harassment necessary to show a hostile work environment or constructive discharge. (Doc. 46-1; *see also* Doc. 55).

Plaintiff opposes OLOL's Motion, in part. Notably, Plaintiff now abandons her retaliation claim (Doc. 49 at p. 34), but still insists that her hostile work environment claim and her constructive discharge claim must proceed to trial (*id.* at pp. 14-34; *see also* Doc. 65). Alternatively, Plaintiff argues that summary judgment is premature because she has filed a motion seeking to compel certain additional discovery from OLOL, which remains pending. (Doc. 49 at pp. 34-35).

## II. ANALYSIS

### A. Standard

Federal Rule of Civil Procedure ("Rule") 56(a) provides that the Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

11

Fed. R. Civ. P. 56(a). If the movant bears its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587. Stated differently, "[i]f the party with the burden of proof cannot produce any summary judgment evidence on an essential element of [her] claim, summary judgment is required." *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990).

## B. Discussion

### i. Hostile work environment

Generally, to establish a race-based hostile working environment claim, a plaintiff-employee must prove: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.[10] *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). The fifth element does not apply, however, where a

---

[10] Plaintiff pursues her hostile work environment claim under 42 U.S.C. § 1981, not Title VII. For all practical purposes, however, the distinction is without difference because the Court "consider[s] racial discrimination and retaliation claims based on Title VII and 42 U.S.C. § 1981 under the same rubric of analysis." *See Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399 (5th Cir. 2021) (quotation marks and alterations omitted)); *cf. Johnson v. Halstead*, 916 F.3d 410, 420 (5th Cir. 2019) ("[R]etaliation claims under § 1981 and Title VII are parallel causes of action, which means they require proof of the same elements in order to establish liability." (quotation marks and alterations omitted)). Accordingly, the Court addresses Plaintiff's hostile work environment claim according to the elements generally required to establish OLOL's liability, without specific citation to the various sources of law.

12

supervisor committed the harassment. *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

OLOL challenges the second, third, and fourth elements of Plaintiff's claim, contending that Plaintiff cannot show that she was harassed; that even if she was harassed any such harassment was *not* based on her race; and, in any event, any harassment Plaintiff endured was not sufficiently severe or pervasive to affect a term or condition of her employment. (*See* Doc. 46-1 at pp. 17-22).

For present purposes, Plaintiff has carried her burden as to the second and third elements of her claim—that is, she has produced sufficient evidence to show that she endured *some* unwelcome race-based harassment. Plaintiff's deposition testimony, coupled with Manager Hill's deposition testimony, creates a substantial dispute regarding whether Dr. Boedefeld harassed and bullied Plaintiff because she is Black. In particular, the Court notes Manager Hill's testimony that Dr. Boedefeld frequently made "generalized complaints" that Black nurses lacked "experience," as well as Manager Hill's testimony regarding Dr. Boedefeld's immediate about-face upon learning that a white nurse (*not* a Black nurse) failed to respond a patient's request for pain medication.

Still, this leaves the issue of whether the harassment Plaintiff endured affected a term, condition, or privilege of employment. "For harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive." *E.E.O.C. v.*

*WC&M Enterprises, Inc.*, 496 F.3d 393, 399 (5th Cir. 2007) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).

> Thus, not only must the victim perceive the environment as hostile, the conduct must also be such that a reasonable person would find it to be hostile or abusive. To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance. No single factor is determinative. In short, a showing that the employee's job performance suffered is simply a factor to be considered, not a prerequisite. ... [E]ven without regard to tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality."

*Id.* at 399–400 (quotation marks, citations, and alterations omitted).

Here, Plaintiff's *allegations* aside, the sum of Plaintiff's *competent* summary judgment *evidence* shows the following: Dr. Boedefeld publicly complained that Plaintiff was hired only because she was Black (in 2012/2013); Dr. Boedefeld twice refused to discuss cases with Plaintiff (in 2012/2013); Dr. Boedefeld twice publicly yelled at Plaintiff (in 2012/2013); Dr. Boedefeld once "questioned" Plaintiff's supervisor (in 2017); a co-worker once publicly referred to Plaintiff as a "bitch" (in 2016); Supervisor Hussain once said at a staff meeting "Vanoy you don't have a voice" (unspecified date); Plaintiff once requested to work a shift in the CICU, and the shift was awarded instead to two "full-time nurses" from another unit (in 2018); and, finally, Supervisor Hussain once refused Plaintiff's request for a meeting to discuss

14

Plaintiff's annual performance review (in 2018).[11]

All told, over the course of seven years and five months at OLOL, Plaintiff suffered 10 insults (minimal frequency). Just *one* arguably involved an inherently racist remark, slur, or confrontation (Dr. Boedefeld's comment that Plaintiff was "hired ... only because [she] was Black"—minimal severity). *None* involved a physical threat, though some were potentially humiliating (*e.g.*, learning of rumors that Plaintiff was hired only because she was Black, and being publicly yelled at, called a "bitch," and told "you don't have a voice"). Finally, and importantly, there is no evidence showing whether (or how) these isolated incidents impacted Plaintiff's work performance. Even assuming that *all* of the foregoing slights were racially motivated, the aggregate of these insults falls well-short of what is required to save a hostile work environment claim from summary judgment. *See, e.g., Simmons v. Triton Elevator, LLC*, 557 F. Supp. 3d 767, 775-779 (N.D. Tex. 2021) (Boyle, J.) (granting summary judgment and dismissing plaintiff's hostile work environment claim due to plaintiff's failure to establish sufficiently "severe and pervasive" harassment despite plaintiff's testimony that in just seven months he endured multiple racial epithets,

---

[11] As set forth above, Plaintiff also alleges systemic discrimination in shift assignments and incentive pay practices at OLOL. Plaintiff's evidence supporting these allegations, however, was vague, at best, consisting solely of her own deposition testimony. Indeed, Plaintiff specifically identified only *one* instance when she was passed over for a shift (when she requested to work in the CICU in February 2018), and could not recall *any* occasion when she was denied opportunities for incentive pay. Likewise, Plaintiff could not identify any other Black colleagues that faced the same (or even similar) mistreatment.

Again, summary judgment evidence "must be particularized, not vague or conclusory." *Guzman*, 18 F.4th at 161; *see supra* n.9. Here, Plaintiff's evidence of systemic discrimination in shift assignments and incentive pay practices lacks sufficient particularity to be credited at summary judgment, and will also be disregarded.

slurs, and offensive interactions with coworkers, where plaintiff failed to show that the remarks were "physically threatening or particularly humiliating," and further failed to show "how the alleged harassment interfered with his performance" (discussing cases)). Plaintiff has not carried her burden as to the fourth element of her hostile work environment claim, thus requiring dismissal. *Geiserman*, 893 F.2d at 793.

### ii. Constructive discharge

"To prove a constructive discharge, a 'plaintiff must establish that working conditions were so intolerable that a reasonable employee would feel compelled to resign.'" *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) (quoting *Faruki v. Parsons*, 123 F.3d 315, 319 (5th Cir. 1997)). Critically, "[c]onstructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Id*.

Having determined that the isolated incidents of harassment that Plaintiff allegedly endured cannot sustain her hostile work environment claim, the Court further determines that they are likewise insufficient to sustain her constructive discharge claim. Plaintiff's constructive discharge claim will also be dismissed.

### iii. Plaintiff's claims will be dismissed despite Plaintiff's pending motion to compel

In a last ditch attempt to avoid dismissal, Plaintiff argues that summary judgment is premature because her motion to compel additional discovery from OLOL remains pending. (Doc. 49 at pp. 34-35). The Court is not swayed.

Rule 56(d) sets forth the procedure by which a nonmoving party may oppose a

motion for summary judgment on the ground that it is premature, stating that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). Here, Plaintiff's counsel has submitted an affidavit explaining that the additional discovery Plaintiff requires "regards potential comparators and is needed evidence [sic] relevant to [Plaintiff's] Title VII and § 1981 claims." (Doc. 49-9 at ¶ 9. Certainly additional "comparator" evidence may be relevant to claims of disparate treatment, *Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001), and retaliation, *see Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 580 (5th Cir. 2020), *as revised* (Aug. 14, 2020). The crux, however, is that Plaintiff has now *abandoned* all such claims. To the point, comparator evidence will *not* save Plaintiff's only remaining claims of hostile work environment and constructive discharge because such evidence is not relevant to the dispositive issue of whether Plaintiff was subjected to objectively severe, pervasive, and/or intolerable harassment.[12] Thus,

---

[12] The Court further finds that Plaintiff has waived the right to argue that comparator evidence *is* relevant to her remaining claims of hostile work environment and constructive discharge by failing to even brief the issue. *See N. Frac Proppants*, 2022 WL 1297180, at *8 n.9 ("Generally speaking, a party waives an issue by failing to adequately brief it. Moreover, the Local Rules require that parties support their arguments with "a concise statement of reasons ... and citations of authorities," M.D. La. LR 7(d), and this Court has repeatedly admonished that it will not speculate on arguments that have not been advanced, or attempt to develop arguments on a party's behalf." (citation omitted)).

Plaintiff's request to delay judgment until after a decision is rendered on her motion to compel will be denied.

### III. CONCLUSION

This Court has repeatedly admonished that summary judgment is about *evidence*, and that a party that fails to direct the Court's attention to any evidence supporting her claims *cannot* carry her burden of showing a genuine, material dispute. *See, e.g., Loolara v. Nat'l Flood Ins. Program*, 551 F. Supp. 3d 626, 630 (M.D. La. 2021) (Jackson, J.). Here, at significant risk, Plaintiff disregarded the Court's Local Rules regarding summary judgment practice, *see supra* n. 1, and ultimately failed to present the evidence required to create a genuine dispute necessitating trial.

Accordingly,

**IT IS ORDERED** that OLOL's **Motion For Summary Judgment (Doc. 46)** be and is hereby **GRANTED** as set forth herein.

**IT IS FURTHER ORDERED** that the above-captioned action be and is hereby **DISMISSED WITH PREJUDICE**.

Judgment shall issue separately.

Baton Rouge, Louisiana, this 25th day of July, 2022

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**